IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

| | |
|---|---|
| SCOTT McCOY, Ph.D.<br><br>Plaintiff,<br><br>v.<br><br>COLLEGE OF WILLIAM & MARY, *et al.*<br><br>Defendants. | Civil Action No.: 4:26cv73 |

**FIRST AMENDED COMPLAINT**

Plaintiff Scott McCoy, Ph.D. ("Vice Dean McCoy"), by counsel, states as follows for his First Amended Complaint against the College of William & Mary (the "College"), Katherine A. Rowe, Ph.D., Peggy Agouris, Ph.D., Kara Fifield, Jenelle M. Job, Ph.D., and Wilmarie Rodriguez, Ed.D. (collectively "Defendants").

**NATURE OF ACTION**

1. This case is about incompetence and misplaced priorities at an otherwise venerable institution of higher education. Famous for its adoption of one of the very first Honor Codes for undergraduate students (est. 1736) and long lauded as the place where President Thomas Jefferson, President James Monroe, and Chief Justice John Marshall matriculated, the College here, however, pushed its values and principles to the side when a gadfly student threatened to sue it over a baseless complaint about a professor who was one of Vice Dean McCoy's subordinate employees. Indeed, even though the College (and its defendant employees) knew full well that the student's complaint lacked merit and that the student himself lacked credibility, the College mollified him. In doing so, the College and the defendant employees threw not only that professor but also Vice Dean McCoy under the proverbial bus.

2. Like most attempts at appeasement, the effort here caused far more harm than good. Vice Dean McCoy was not even the immediate target of the student's initial complaint. However, because he was secondarily involved in trying to resolve the student's baseless complaint about the *other* professor, he got swept into the fray. He was libeled, his rights were violated, and he has suffered substantial and irreparable harm. As such, Vice Dean McCoy now brings this action for (i) defamation, (ii) the violation of his due process rights under the United States Constitution, (iii) First Amendment retaliation, and (iv) the violation his rights under Title II of the Americans with Disabilities Act ("ADA").

## Parties

3. Vice Dean McCoy is an individual resident of Richmond, Virginia.

4. The College is a public university located in Williamsburg, Virginia.

5. Defendant Rowe, upon information and belief, is an individual resident of Williamsburg, Virginia. She is sued in her official and individual capacities.

6. Defendant Agouris, upon information and belief, is an individual resident of Williamsburg, Virginia. She is sued in her official and individual capacities.

7. Defendant Fifield, upon information and belief, is an individual resident of Pennsylvania. She was formerly a resident of Virginia. She is sued in her individual capacity.[1]

8. Defendant Job, upon information and belief, is an individual resident of Williamsburg, Virginia. She is sued in her individual capacity.

9. Defendant Rodriguez, upon information and belief, is an individual resident of Williamsburg, Virginia. She is sued in her individual capacity.

---

[1] When Vice Dean McCoy initially filed this lawsuit, he believed Fifield was a resident of Virginia. This may have been mistaken, because at some time after she left her position at the College, Fifield moved to Pennsylvania to take a position at Bucknell University.

## JURISDICTION AND VENUE

10. This Court has federal subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331. It has pendent and supplemental jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367.

11. Separately, this Court may have diversity jurisdiction over the state law claim against Fifield. At the time of the filing of this lawsuit, Fifield was either a citizen of Virginia or a citizen of Pennsylvania. If she is the latter, then this Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because (i) she and Vice Dean McCoy are citizens of different states and (ii) the amount in controversy exceeds $75,000.[2]

12. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events giving rise to the claims occurred.

## FACTUAL BACKGROUND

### A. THE KEY PLAYERS.

13. Vice Dean McCoy is a well-credentialed, well-respected, and ***tenured*** professor in the Raymond A. Mason School of Business at the College. He has been a professor for more than twenty years, and he has had tenured status since 2008. Vice Dean McCoy also is, and at all times, has been the Vice Dean of Faculty and Academic Affairs for the School of Business. He has held that position for the last year and a half. Vice Dean McCoy holds a Ph.D. in Business from the University of Pittsburgh, an M.S. degree in Management Information Systems from Middle Tennessee State University, and a B.A. in Business Administration from Flagler College.

14. At all relevant times herein, Rowe is and has been the President of the College. In her role as President, she, along with 38 other presidents of Virginia's colleges and universities signed

---

[2] If the question of whether diversity jurisdiction exists in this case becomes outcome dispositive for the claim against Fifield, Professor Skimmyhorn asks for jurisdictional discovery on the matter.

onto a public statement unequivocally supporting academic freedom. The statement, released by the Council of Presidents, stated:

> As presidents of Virginia's public colleges and universities, we unequivocally support free expression and viewpoint diversity on our campuses. Free expression is the fundamental basis for both academic freedom and for effective teaching and learning inside and outside the classroom. Our member universities and colleges are bound to uphold the First Amendment. We are committed to promoting this constitutional freedom through robust statements and policies that are formulated through shared governance processes and through actions that reflect and reinforce this core foundation of education. We value a scholarly environment that is supported by a diversity of research and intellectual perspectives among our faculty and staff. We pledge to promote and uphold inclusivity, academic freedom, free expression, and an environment that promotes civil discourse across differences. We will protect these principles when others seek to restrict them.

https://www.education.virginia.gov/media/governorvirginiagov/secretary-of-education/pdf/Council-of-Presidents-Statement-on-Free-Expression.pdf (visited on April 20, 2026).

15. At all relevant times herein, Agouris is and has been the Provost of the College.

16. At all times prior to January 23, 2026, Fifield was an employee of the College and served as its Director of the Student Accessibility Services ("SAS") at the College. She held that position for three years – right up until the time she abruptly and without explanation left her employment at the College effective January 23, 2026. As part of her duties as the SAS Director, Fifield helped students coordinate the taking of certain exams and using the SAS's testing center (the "Testing Center").

17. At all times relevant herein, Job is and has been an employee of the College and has served as the Director of Title IX and Civil Rights Compliance. As part of her duties, Job leads the College's Civil Rights Team ("CRT"). In this capacity, she receives, reviews, interprets, and prepares complaints and then presents these complaints to the CRT to authorize investigations when students make allegations that students or employees have violated Title IX or other civil rights statutes, such as the ADA. Job has held this position for at least the last two years.

18. At all times relevant herein, Rodriguez is and has been an employee of the College and has served as the Assistant Vice President of Student Success. In that capacity, she helps to provide oversight of the SAS. Relevant here, Rodriguez worked with Fifield and also participated in the investigation into the student complaint against Vice Dean McCoy, serving as a witness *against* Vice Dean McCoy.

**B. "STUDENT A"'S BASELESS ADA COMPLAINT AGAINST PROFESSOR SKIMMYHORN.**

19. On or about March 21, 2025, a student ("Student A") in a class taught by School of Business Professor William Skimmyhorn ("Professor Skimmyhorn") went to the SAS office to seek assistance with respect to certain accommodations he believed he had been denied by Professor Skimmyhorn.

20. In particular, Student A claimed that, contrary to the ADA accommodations that the SAS office had authorized for him, Professor Skimmyhorn improperly denied him use of a laptop computer for a February 27, 2025 quiz. He raised this complaint (i) even though he had not previously spoken to Professor Skimmyhorn about the need for a laptop computer for the quiz at issue and (ii) only after he learned he had failed the quiz.

21. During the course of Student A's initial meeting with Fifield at the SAS office, Fifield disparaged Professor Skimmyhorn with numerous false and defamatory statements, including that (i) the SAS office "had issues with this professor [Professor Skimmyhorn] in the past"; (ii) he had a "track record" (of denying accommodations); (iii) one of the "previous issues" with him involved "accommodations implementation"; (iv) "this is not the first time this has happened" (i.e., denying accommodations); and (v) "this has happened" (i.e., he has denied accommodations) "multiple times and multiple semesters." She said that Professor Skimmyhorn was "making it hard" for her office to implement accommodations ADA. As a result, Student A then pursued an ADA claim

against Professor Skimmyhorn by falsely accusing Professor Skimmyhorn of denying him an approved ADA accommodation.

**C. "STUDENT A"'S BASELESS ADA COMPLAINT IS INVESTIGATED AND CLOSED.**

22. Student A's ADA complaint centered on the meaning of the words "written output." Specifically, in his SAS letter dated February 10, 2025, Student A was approved to use a computer (a laptop) to take tests and quizzes in his classes where those tests and quizzes required "written output" and where the student had coordinated with the professor at issue for such use.

23. At the time, Professor Skimmyhorn's understanding of "written output" for accommodation purposes was that it meant "essays," but it did not apply to "multiple choice, fill-in the blank, short answer, graphing/charting, and formula type questions."

24. Professor Skimmyhorn based his understanding on an e-mail from Vice Dean McCoy, who clearly and unambiguously set forth this precise meaning in an e-mail he sent to the entire School of Business faculty on February 11, 2025.

25. That same definition also had been provided to Professor Skimmyhorn by multiple SAS employees during the Fall 2024 semester, and Professor Skimmyhorn shared this understanding with Vice Dean McCoy.

26. The text of Vice Dean McCoy's e-mail was the product of a lengthy collaborative effort between Vice Dean McCoy and the SAS office. The collaborative effort included the following events:

- On December 13, 2024, Vice Dean McCoy had a Teams meeting with Fifield to discuss among other things, the meaning of "written output" for purposes of ADA accommodations for students at the Business School. Vice Dean McCoy sent an e-mail to Fifield the next day

summarizing the contents of their meeting, *including the definition of "written output" which was for essays.*

- On December 16, 2024, Fifield responded to Vice Dean McCoy's e-mail and raised some clarifications about Vice Dean McCoy's summary. Significantly Fifield never contradicted in her e-mail Vice Dean McCoy's description of the definition of "written output" that was discussed at the December 13, 2024 meeting.
- On January 23, 2025, Fifield sent Vice Dean McCoy an email requesting a meeting to follow up on some matters that remained unresolved even after the December 13, 2024 meeting. Those unresolved matters focused on testing protocols and had nothing to do with "written output."
- On February 7, 2025, Vice Dean McCoy had a further Teams Meeting with Fifield and others (including Rodriguez, Carla Costello, and Sarah Melchior Lorio, Assistant University Counsel for the College) where the group edited a summary draft e-mail prepared by Vice Dean McCoy that would be sent out to all Business School faculty concerning SAS accommodations and which included a definition of "written output.".
- Finally, days later, on February 11, 2025, Vice Dean McCoy sent the final draft of his e-mail to all faculty at the Business School. Vice Dean McCoy copied Fifield (and others) on the e-mail.

27. Based on his understanding of "written output" (from Vice Dean McCoy's e-mail), Professor Skimmyhorn allowed laptops as accommodations where his class quizzes required written essays. His Spring 2025 BUAD 323 class, however, had no such essay questions on the quizzes.

28. Notwithstanding that none of the quizzes in Professor Skimmyhorn's Spring 2025 BUAD 323 class required written essays as answers – and thus no "written output" – Student A, after completing and failing the first quiz, believed he had been improperly denied the use of a laptop computer for his first quiz. Professor Skimmyhorn, however, disagreed. Professor Skimmyhorn's position was and is correct.

29. As noted above, Student A, however, immediately went to the SAS office to complain that he had been wrongfully denied an accommodation – which is when Fifield first defamed Professor Skimmyhorn to Student A, all as stated above.

30. Student A's complaint against Professor Skimmyhorn was baseless, and the SAS office, especially Fifield, knew it.

31. Indeed, Student A was no stranger to the SAS office or Fifield. Long before he raised his complaint against Professor Skimmyhorn, a College proctor in the testing center had reported to Fifield that she suspected Student A had cheated on an exam by using accommodations -- specifically the use of a computer – to assist him.

32. Fifield did nothing to act on the proctor's serious allegation and instead swept it under the rug. Upon information and belief, she did this because Student A's mother and Student A pressured her to do so. In so doing, Fifield ignored the long-held values and principles associated with the College and let the issue slide by bowing to outside pressure.

33. Similarly here, Fifield sided with Student A and, indeed, further defamed Professor Skimmyhorn *during the investigation* into Student A's complaint. Specifically, in written responses

that she submitted to the investigators, Fifield falsely told them that Professor Skimmyhorn had "not attended a training for ADA," suggesting that he was ignorant of the ADA.[3]

34. Fifield's defamation also extended to the entire Business School – specifically implicating Vice Dean McCoy. In April of 2025, when he met with Vice Dean McCoy, Dean Todd Mooradian and Job to discuss his complaint against Professor Skimmyhorn, Student A repeated what Fifield had told him and reported that the SAS office had told him that there were accommodations not being provided by the Business School faculty and that they (Business School faculty) had not attended required training.

35. Job was sufficiently shocked by this defamation that she called Professor Guthrie after this meeting. Professor Guthrie, in turn, was equally shocked and was especially concerned about Student A's false accusations against Professor Skimmyhorn. She immediately alerted the Provost about Job's report with an e-mail that said:

> Hi Peggy,
> Quick Update (!!):
> We have since run into a serious problem today. We were just made aware (by a current student ***<u>of Bill's</u>*** who claims his accommodations were not met) that in a meeting with Todd, Scott McCoy, and Jenelle Job that ***<u>Kara Fifield in Student Success has been slandering Bill and in general the business school faculty to current students (and their families).</u>***
>
> ***<u>In a meeting with this student and his mother, Kara also disclosed the details of the case Bill was working on last semester (with regards to the Testing Center and an Honor Code violation). This is the case in which Bill found Kara in serious violation of many procedures etc</u>***
>
> This student's mom also recorded (!) the entire conversation with Kara (the one today as well). Note: all conversations with this student are often recorded.
>
> I would get the details of this conversation from those present in the meeting (Todd, Scott, and Jenelle). I know that Jenelle feels that an audit of what is happening over there is become a necessary next step.

---

[3] Professor Skimmyhorn has separately sued Fifield for the defamation referenced herein.

Good luck 😵
Katherine

(emphasis added).

36. The Provost responded by e-mail and indicated that she too found Student A's comments to be troublesome. She wrote:

> Thank you, Katherine.
>
> I agree—***this is really unsettling***. I had already raised the issue you and Bill discussed with me a few months ago with several key individuals, but given the urgency, I will re-engage and ***ensure it receives the attention it deserves***. I'll be back in touch with you soon.
>
> Peggy

(emphasis added).

37. Fifield separately defamed Vice Dean McCoy during the investigation. In written "testimony" that she provided to the College's investigators, Fifield was asked "Do you recall a memo on output" (a reference to Vice Dean McCoy's e-mail to the Business School). Rather than agreeing that it was accurate, Fifield said "Yes. Scott McCoy, we talked about the matter, and he took notes. ***He then sent a memo to MSOB faculty without approval from SAS based on his notes***."

38. Fifield's statement about the "memo" was false. Vice Dean Mcoy did ***not*** send out the e-mail without SAS approval, ***and***, it was not based on his "notes" – it was based on the feedback he had received from discussions with the SAS office and Associate University Counsel.

39. For his part, during the investigation, Professor Skimmyhorn fully defended his actions vis-à-vis Student A and made it clear that he had done nothing to interfere with the implementation of Student A's accommodations.

40. Ultimately, the investigation into Student A's complaint was closed because Student A withdrew his complaint. Apparently, after Student A initiated his internal ADA complaint, he also

initiated an outside Civil Rights complaint with the Department of Education *and threatened to sue* the College. The College, in turn, apparently decided it was better to capitulate to Student A and to reach some sort of settlement, rather than letting the investigations run their courses (which would have fully exonerated Professor Skimmyhorn). Job and others were instrumental in reaching the settlement. Even so, no one at the College ever made any finding of wrongdoing as to Student A including his ADA accommodation request for BUAD 323.

### D. Vice Dean McCoy Becomes Collateral Damage As A Result Of The Baseless Complaint Against Professor Skimmyhorn.

41. A key component of Professor Skimmyhorn's defense against Student A's complaint was Vice Dean McCoy's e-mail about what constituted "written output." As such, he identified Vice Dean McCoy as a key witness on his behalf and also supplied the February 11, 2025 e-mail as part of his defense.

42. Other than that, Vice Dean McCoy was only minimally connected to Student A's complaint. For example, on April 22, 2025, he met with Student A to try to assist him in resolving his concerns after he made an initial informal complaint against Professor Skimmyhorn (i.e., before it turned into a formal complaint). Student A, however, demanded a "Pass" in the class as his resolution, which Vice Dean McCoy would not agree to.

43. Student A then targeted Vice Dean McCoy by filing an ADA complaint against him on July 1, 2025. Vice Dean McCoy had previously met with Student A informally and explained to him what constituted "written output" for purposes of his ADA accommodation. Unhappy with this outcome, Student A raised numerous complaints of ADA discrimination against him. These claims included allegations that Vice Dean McCoy had (i) "disputed that the claimant was denied the use of an approved disability accommodation" (because of the "written output" definition); (ii) entered the testing center on May 15, 2025 during an exam Student A was taking and "sat behind" Student A the

entire time; (iii) through his "movements, body language, and/or audible expressions" at the testing center on May 15, 2025, denied Student A an approved accommodation; (iv) accused Student A of receiving "special treatment" when he left the testing center to go to the bathroom; and (v) wrongly reported him for a violation of the Honor Code based on Student A's conduct during the May 15, 2025 examination.

44. Student A's allegations against Vice Dean McCoy were baseless and provably false. Vice Dean McCoy committed ***none*** of the alleged conduct at issue. But even more, the testing center has cameras that provide video footage of the entire testing area during the entire time of a testing session. Video footage proved beyond question that Student A's allegations were false and, almost certainly, were *knowingly false.*

45. Student A's complaint against Vice Dean McCoy went to the CRT for initial review. Under the College's applicable complaint procedures, the CRT, including Job, must fully review and assess such a complaint before allowing it to officially move forward. It does not – and cannot – simply rubber stamp a complaint *simply because it is a student complaint*.

46. The CRT's complaint review process is governed by the College's "Employee Discrimination & Title IX Complaint Procedure."[4] In relevant part, it states:

> **Initial Assessment**
>
> Upon receipt of a report, the Review Team will conduct an initial assessment. The Review Team may conduct confidential, preliminary inquiry, not including interviews with parties, to verify enrollment or employment status, to help determine jurisdiction and/or the appropriate procedure under which to process the matter.
>
> The Review Team makes an initial determination as to the appropriate course of action ***after considering***
>
> - the reported misconduct;

---

[4] https://www.wm.edu/offices/ce/policies/audit-risk-and-compliance/employee-discrimination-procedure.php#v (visited on February 13, 2026)

- any information provided ***or collected***;
- applicable law and policy, determining which university procedure has jurisdiction over the reported misconduct;
- the complainant's filing of a formal complaint; and
- ***any evidence that a report was not made in good faith or is baseless***.

(emphasis added).

47. Further, the CRT has the authority – and duty – to reject baseless complaints. As the policy states, the CRT should take "no further action" under the following circumstances:

> No action under this procedure may be appropriate for formal complaints that do not allege conduct that violates applicable university policy, formal complaints for which ***there is insufficient information to initiate an investigation***, or reports where the person reported to have experienced the misconduct has requested no action and the Review Team's assessment concludes that this request may be honored (see below), or formal complaints of matters for which the university does not have jurisdiction. No action may also be appropriate when there is evidence that a report ***is baseless or not made in good faith***, although more typically some investigation is required to make such a determination.

(emphasis added).

48. Here, Job utterly failed to do any preliminary assessment of Student A's baseless allegations. Had she done so, even if she had just reviewed the video from the testing center or interviewed the exam proctors, she would have immediately rejected Student A's allegations out of hand.

49. Instead, it appears that Job actually *encouraged* Student A to file his complaint against Vice Dean McCoy. In an e-mail dated June 10, 2025 to Student A, Job said:

> I have read your email and letter. I understand that you have ongoing concerns with retaliation by Vice Dean McCoy. Recently, we talked about submitting a formal complaint detailing his retaliatory actions. Having read your letter, this complaint may extend to other members of the MSOB faculty and/or administration. I will facilitate review of any formal complaint submitted and have again attached our form for this purpose. I understand that we discussed waiting until an incident report for an alleged Honor Code violation was submitted. ***With Dr. McCoy indicating in writing this afternoon that he intends to refer you to the Honor Council, I believe we have reached this point.*** Please let me know if you are perceiving things differently, or if there is a different way I can support you.

(emphasis added).

50. Worse, Job, by July 1, 2025, already ***knew*** from her own personal experience with Student A that he was a prevaricator. Specifically on April 28, 2025, after Student A had met with Job about potential ADA accommodations for his final exam in Professor Skimmyhorn's BUAD 323 class, he sent an e-mail dated April 28, 2025 to the Business Schools' Department of Finance Chair, Dr. Katherine Guthrie, telling her that "[f]ollowing my conversation earlier today with Dr. Job, I understand that completing the BUAD 323 final exam in an oral format is an appropriate and reasonable option given the disability accommodations I have through Student Accessibility Services."

51. Student A's statement, however, was false in numerous respects. An oral examination was *not* an appropriate or reasonable option for his final exam under these circumstances. But just as important, Job ***did not tell*** Student A that an oral examination for the class was appropriate or reasonable. Student A was lying.

52. Job also ***knew*** that Student A was lying. Indeed, she immediately wrote Dr. Guthrie to tell her that Student A had "misrepresented our conversation" and that she needed to address that with him directly. She then sent an e-mail directly to Student A that, in relevant part, said: "Your relay of our conversation to Dr. Guthrie ***misrepresents*** what we discussed and my guidance to you." (emphasis added). In other words, more than two months before Student A collaterally attacked Vice Dean McCoy for telling the truth about what qualified as "written output" for ADA purposes, Job ***knew*** that Student A's word could not be trusted.

53. To add insult to injury, both Fifield and Rodriguez piled on and also defamed Vice Dean McCoy during the investigation into Student A's complaint. For Rodriguez, in her written testimony to the College's investigators, she stated, "Dr. McCoy also reminded us that the student

was not to have any extra materials, and he provided written instructions stating that the student should not be allowed to leave the SAS area during the exam." These statements were false and Rodriguez either knew or should have known they were false.

54. Vice Dean McCoy never provided Student A with any written instructions stating he should not be allowed to leave the SAS area during the exam. Job communicated exam instructions to Student A. Vice Dean McCoy did not give any written instructions. In a later interview with Fifield, Rodriguez said she would try to find Vice Dean McCoy's purported instructions to Student A. They never surfaced, however, because they never existed. This statement by Rodriguez was false and was an attempt to portray Vice Dean McCoy as treating Student A unfairly.

55. Rodriguez also defamed Vice Dean McCoy when she told investigators: "During this time, Dr. McCoy appeared to take notes on every interaction, make phone calls, and at times, had other Business School personnel come by, which caused significant disruption for the student, the proctor, the SAS staff, and myself."

56. The video footage from outside the SAS offices and the video footage within the testing center room, however, flatly refutes these statements and, instead, confirms that Vice Dean McCoy: (i) never made any phone calls; (ii) never caused any disruptions; and (iii) met with two staff members from the Business School, but did so *away* from the SAS testing center.

57. In similar fashion, Fifield defamed Vice Dean McCoy when, after being asked where Vice Dean McCoy was in the testing center while Student A was taking the quiz and test, she told the College investigators that "He [McCoy] was behind [Student A] in the Testing Center. He was pretty close. The proctor (MSOB GA) who was sitting next to Peyton was the closest person to Peyton, but Professor McCoy was behind him. Peyton was at Desk 9 and McCoy was at Desk 11. Occasionally, McCoy would get up and walk to the desks behind Peyton (Desks 12 & 13). He would get close."

58. These statements too were false. Other than when Vice Dean McCoy got "Student A" started with the quiz and exam (at the beginning of the process) and when collecting the exam materials and laptop at the end of the process, Vice Dean McCoy was not "close" to Student A; he did not walk to the desks behind Student A; and he was not "behind" Student A. Again, the video footage within the testing center room refutes these statements.

59. In the end, like the complaint against Professor Skimmyhorn, the complaint against Vice Dean McCoy was withdrawn by Student A, and the matter was closed. As noted above, however, this closure was the result of the College's fecklessness as to the baseless complaints and instead, its desire to seek appeasement. Vice Dean McCoy was never given an opportunity to fully clear his name as part of the investigation. Even so, the investigation resulted in ***no findings of wrongdoing by Vice Dean McCoy.***

### E. VICE DEAN MCCOY RAISES BROAD CONCERNS ABOUT THE TESTING CENTER AND CHEATING CONCERNS.

60. In February 2025, well before Student A filed his complaint against him (or even Professor Skimmyhorn), Vice Dean McCoy met with Pam Eddy (the Associate Provost for Faculty Affairs and Development at the time) to discuss his own concerns about the Testing Center and potential cheating on laptops. These were similar to concerns he had long been raising with fellow colleagues within and without the Business School.

61. Vice Dean McCoy repeated those concerns in April of 2025 in discussions with his Dean of the Business School. Among other things, Vice Dean McCoy was concerned about how students had great potential to cheat when allowed to use personal laptop computers at the Testing Center.

62. And even *after* all the false allegations arising from Student A's complaint, Vice Dean McCoy joined Professor Skimmyhorn in December of 2025 in two separate meetings with Agouris

raising these same concerns.

63. As well, in at least one of those meetings, Professor Skimmyhorn, Vice Dean McCoy and the Provost discussed Student A's ADA complaint and the resolution of it by the College. The Provost commented that the College simply wanted to "wrap it up" [the complaint] and further stated that "she was not proud" the College's settlement of the matter.

64. None of the discussions about Vice Dean McCoy's concerns about the Testing Center or cheating were required, or done pursuant to, his job duties at the College.

**F. THE COLLEGE RETALIATES AGAINST VICE DEAN MCCOY.**

65. Because of his participation in the ADA investigation and *because* of his raising of concerns that Student A committed an Honor Code violation, the College, by and through Job and others, retaliated against him. It did so in at least two ways that are presently known.

66. First, even though by late April 2025, Job ***knew*** that Student A was not credible, she nevertheless allowed his retaliatory complaint against Vice Dean McCoy to go forward. This means that Vice Dean McCoy now must answer "Yes" on any future job applications in response to any questions about whether he has ever been the subject of a workplace investigation or whether he had ever been accused of violating a student's rights.

67. Second, *even though* the investigation into Student A's complaint was closed without any finding that Vice Dean McCoy did anything wrong, the College, through Rowe and Agouris, imposed a requirement that he take mandatory ADA training. This was not a regularly scheduled or university-wide training class. Instead, this was training specifically designed and designated for him and others who were named in Student A's complaint.

### G. THE FINAL ACT: FIFIELD FURTHER DEFAMES VICE DEAN MCCOY.

68. In the aftermath of Student A's allegations about what qualifies as "written output," Professor Skimmyhorn asked for clarification from the SAS office on October 27, 2025. That same day, Fifield responded to Professor Skimmyhorn and told him that written output now means where a "student has to write a sentence or more." This was a substantial change from her prior position on the issue and was inconsistent with what she had previously told Vice Dean McCoy.

69. Upon seeing Fifield's e-mail to Professor Skimmyhorn, Vice Dean McCoy followed up with her by e-mail and asked: "Has SAS changed the definition of written output?" He also explained that from their prior conversations, "written output" only applied to "essay questions."

70. Fifield responded – with an e-mail to McCoy that copied not only Professor Skimmyhorn and Dr. Guthrie but also Associate University Counsel for the College – and said

> "The definition of 'written output' is *one sentence or more*. This is not a policy change. We recognize that there has been **some miscommunication regarding this point** but moving forward, this will be the standard definition when this accommodation is granted.

(italics in original; bold and underscore added).

71. This was Fifield's attempt to blame Vice Dean McCoy for the entire Student A fiasco by suggesting he (i) had misstated the proper definition of "written output" to the entire Business School back in February of 2025; and (ii) had done so because ***he*** had miscommunicated with her and/or did not understand what she had allegedly previously told him.

72. Fifield's statements and implications were false. Vice Dean McCoy accurately stated what he had been previously told by Fifield and he did not misunderstand anything about her prior communications.

## H. AFTERMATH.

73. Because of Fifield's and Rodriguez's false and defamatory statements and because of the College's, Rowe's, Agouris's, and Job's actions, Vice Dean McCoy's reputation at the College, especially within the SAS office and in the eyes of the Dean, the Provost, and the President, has been irreparably harmed and damaged.

74. Moreover, the statements and actions described herein have severely impaired and devalued Vice Dean McCoy's property interest regarding his tenured employment at the College. Indeed, if Vice Dean McCoy now tries to seek a tenured college or university position elsewhere, he has to answer "Yes" on any employment application to questions that ask if he has ever had a civil rights complaint filed against him or whether he has ever been formally accused of violating a student's civil rights or whether he has been the subject of a workplace investigation.

75. Vice Dean McCoy also has suffered substantial emotional distress.

## COUNT I:
## DEFAMATION
## (AGAINST FIFIELD)

76. The allegations of paragraphs 1-75 are realleged as if fully set forth herein.

77. Vice Dean McCoy has been defamed by the statements made and published by Fifield that are specifically referenced and set forth in paragraphs 34, 37, 57, and 70 of the Complaint.

78. These false statements were published, and they were made with the requisite intent to defame Vice Dean McCoy.

79. The statements at issue are false and purport to be statements of fact, not statements of opinion.

80. Moreover, the false statements all involve the efforts of Fifield to demean and disparage Vice Dean McCoy and to falsely accuse him of unlawful behavior, unprofessional occupational activities, conduct that prejudices him in his profession, unfitness to perform the duties of his job and/or a lack of integrity in the performance of his duties. These statements, especially when made about an educational professional such as Vice Dean McCoy here, constitute defamation per se.

81. As a proximate cause of the conduct of Fifield, Vice Dean McCoy has suffered substantial compensatory damages, including severe mental and emotional distress, reputational harm, loss of sleep, humiliation, embarrassment, loss of time, and other damages. He is also entitled to presumed damages.

82. In addition, the false statements made about Vice Dean McCoy by Fifield were made intentionally, willfully, and maliciously against Vice Dean McCoy and with utter and conscious disregard of his rights.

83. The false and defamatory statements about Vice Dean McCoy were made negligently and with reckless disregard to whether they were true or not.[5]

84. Finally, no privileges, qualified or absolute, attach to these statements, and Vice Dean McCoy is also entitled to punitive damages in this matter.

**COUNT II:**
**DEFAMATION**
**(AGAINST RODRIGUEZ)**

85. The allegations of paragraphs 1-84 are realleged as if fully set forth herein.

86. Vice Dean McCoy has been defamed by the statements made and published by

[5] Vice Dean McCoy states that he is not a public official, public figure, or limited purpose public figure and thus is only required to plead and prove negligence to maintain his defamation action.

Rodriguez that are specifically referenced and set forth in paragraphs 53 and 55 of the Complaint.

87. These false statements were published, and they were made with the requisite intent to defame Vice Dean McCoy.

88. The statements at issue are false and purport to be statements of fact, not statements of opinion.

89. Moreover, the false statements all involve the efforts of Rodriguez to demean and disparage Vice Dean McCoy and to falsely accuse him of unlawful behavior, unprofessional occupational activities, conduct that prejudices him in his profession, unfitness to perform the duties of his job and/or a lack of integrity in the performance of his duties. These statements, especially when made about an educational professional such as Vice Dean McCoy here, constitute defamation per se.

90. As a proximate cause of the conduct of Rodriguez, Vice Dean McCoy has suffered substantial compensatory damages, including severe mental and emotional distress, reputational harm, loss of sleep, humiliation, embarrassment, loss of time, and other damages. He is also entitled to presumed damages.

91. In addition, the false statements made about Vice Dean McCoy by Rodriguez were made intentionally, willfully, and maliciously against Vice Dean McCoy and with utter and conscious disregard of his rights.

92. The false and defamatory statements about Vice Dean McCoy were made negligently and with reckless disregard to whether they were true or not.

93. Finally, no privileges, qualified or absolute, attach to these statements, and Vice Dean McCoy is also entitled to punitive damages in this matter.

### COUNT III:
### PROCEDURAL DUE PROCESS CLAIM
### (AGAINST THE COLLEGE, ROWE, AGOURIS AND JOB)

94. The allegations of paragraphs 1-93 are realleged as if fully set forth herein.

95. Because he is a tenured professor at the College, Vice Dean McCoy has a property interest in his employment (and interests related thereto) and thus he has due process rights under the U.S. Constitution to receive notice and a full and fair review of any allegations against him that will impair, interfere with, or devalue those rights.

96. Here, however, the College, Rowe, Agouris, and Job deprived Vice Dean McCoy of his due process rights under the U.S. Constitution by denying him proper due process prior to (i) failing to conduct even the most rudimentary or basic investigation of Student A's false allegations against Vice Dean McCoy before enabling and supporting Student A's ADA complaint; (ii) closing the investigation into Student A's investigation without allowing him to present his defense to the complaint; and (iii) requiring him to undergo ADA training even after closing the investigation into Student A's complaint. In doing so, the College and Job, without due process, have falsely indicated that Vice Dean McCoy actually violated Student A's rights and have thus impaired, interfered with, and devalued his property rights.

97. As a result of the College's, Rowe's, Agouris's, and Job's actions, Vice Dean McCoy's professional growth as a tenured professor has been stunted and impeded. In particular, even though Vice Dean McCoy still has tenure, the *value* of that tenure as a property interest has been greatly lessened because, among other things, (i) internally, at the College, the fact that a complaint was made and an investigations was conducted is known among Vice Dean McCoy's peers, colleagues, and superiors, diminishing his opportunities to advance at the College; and (ii) Vice Dean McCoy now has to disclose the *fact* of the baseless investigations to potential future

employers, unlawfully tarnishing his employment as a tenured Professor at the College.

**COUNT IV:**
**FIRST AMENDMENT RETALIATION**
**(AGAINST THE COLLEGE, ROWE, AGOURIS, AND JOB)**

98. The allegations of paragraphs 1-98 are realleged as if fully set forth herein.

99. Vice Dean McCoy engaged in protected activities under 42 U.S.C. § 1983 (through the Fourteenth Amendment of the Constitution) when he exercised his rights under the First Amendment of the Constitution to speak on matters of public concern about (i) the integrity of the SAS office; and (ii) reporting Student A for a potential Honor Code violation. None of Vice Dean's communications about these matters were raised as part of, or pursuant to, his job or occupational duties at the College. Instead, they were broad-based concerns about the overall workings of the SAS and the overall integrity of the Honor System at the College.

100. The College, Rowe, Agouris, and Job were well aware of Vice Dean McCoy's protected activities and/or believed that he had engaged in such protected activities and were well aware that any retaliation based on Vice Dean McCoy's protected activities would violate his rights under clearly established law.

101. Notwithstanding this awareness, the College, Rowe, Agouris, and Job violated Vice Dean McCoy's rights under the First Amendment when they (i) closed the investigation into Student A's investigation without allowing him to present his defense to the complaint; and (ii) required him to undergo ADA training even after closing the investigation into Student A's complaint, as a result of his protected speech.

102. As a direct result of the College's, Rowe's, Agouris's, and Job's actions, in violation of the rights secured to Vice Dean McCoy under Section 1983, Vice Dean McCoy has been caused to suffer the loss of his professional potential and all of the benefits that go with it.

Additionally, Vice Dean McCoy has been caused to suffer personal injury, loss of sleep, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of the College's and Job's actions.

**COUNT V:**
**RETALIATION UNDER THE ADA**
**(AGAINST THE COLLEGE, ROWE, AGOURIS, AND JOB)**

103. The allegations of paragraphs 1-102 are realleged as if fully set forth herein.

104. Vice Dean McCoy engaged in protected activity under Title II of the ADA when he participated in the investigation related to Student A's ADA complaints – against both him *and* against Professor Skimmyhorn.

105. As a result of Vice Dean McCoy's protected activity, the College, Rowe, Agouris, and Job retaliated against him by, among other things, (i) closing the investigation into Student A's investigation without allowing him to present his defense to the complaint; and (ii) requiring him to undergo ADA training even after closing the investigation into Student A's complaint, as a result of his protected activities.

106. As a result of the College's, Rowe's, Agouris', and Job's actions, Vice Dean McCoy has suffered damages, including emotional pain and suffering, loss of sleep, embarrassment, inconvenience, mental anguish, and loss of enjoyment of life.

WHEREFORE, Plaintiff requests this Honorable Court to:

a. Accept jurisdiction of this case;

b. Award Plaintiff compensatory damages against Fifield for humiliation, mental and emotional distress, and pain and suffering that he has experienced and endured as a result of the unlawful actions of Fifield towards him. Such

damages shall be in an amount not to exceed THREE MILLION DOLLARS ($3,000,000.00), the exact amount to be determined at trial;

c. Award Plaintiff presumed damages against Fifield in an amount not to exceed TWO MILLION DOLLARS ($2,000,000.00), the exact amount to be determined at trial;

d. Award Plaintiff compensatory damages against Rodriguez for humiliation, mental and emotional distress, and pain and suffering that he has experienced and endured as a result of the unlawful actions of Rodriguez towards him. Such damages shall be in an amount not to exceed THREE MILLION DOLLARS ($3,000,000.00), the exact amount to be determined at trial;

e. Award Plaintiff presumed damages against Rodriguez in an amount not to exceed TWO MILLION DOLLARS ($2,000,000.00), the exact amount to be determined at trial.

f. Award Plaintiff punitive damages against Fifield, Rodriguez, Rowe, Agouris, and Job in an amount not to exceed THREE HUNDRED FIFTY THOUSAND DOLLARS ($350,000.00), the exact amount to be determined at trial;

g. Award Plaintiff compensatory damages against the College, Rowe, Agouris, and Job for loss of future earning potential, diminished value of his property interest in his tenured employment, humiliation, mental and emotional distress, and pain and suffering that he has experienced and endured as a result of its unlawful actions of towards him. Such damages shall be in an amount not to exceed FIVE MILLION DOLLARS ($5,000,000.00), the exact amount to be determined at trial;

h. Grant Plaintiff an injunction against at least Rowe and Agouris to prevent him from being required to undergo any mandatory training resulting from the settlement of Student's A's OCR case against the College;

i. Award Plaintiff his reasonable attorney's fees and costs;

j. Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

k. Grant such other and further relief as to the Court seems just and proper.

**A TRIAL BY JURY IS DEMANDED**.

SCOTT McCOY, Ph.D.

By: /s/Richard F. Hawkins, III___

Richard F. Hawkins, III
Virginia Bar Number: 40666
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 23220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)
Email: rhawkins@thehawkinslawfirmpc.com

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of September, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF systems which will send notification of such filing to the following:

Robyn H. Hansen (VSB #23134)
Brian G. Muse (VSB #47218)
SANDS ANDERSON PC
4801 Courthouse Street, Suite 203
Williamsburg, Virginia 23188
Tel: (757) 276-8243
Fax: (757) 378-5409
rhansen@sandsanderson.com

Counsel for all defendants

s/ Richard F. Hawkins, III
Virginia Bar Number: 40666
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 23220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)
Email: rhawkins@thehawkinslawfirmpc.com

Counsel for Plaintiff